Observant among you will notice that there are only two of us. Judge Stoll was stranded by weather, out of town, but she will hear the recording of the argument and be a full participant in the case. So we will proceed. This is Brigham and Women's Hospital v. Perrigo, 2017-1950. Mr. Gargano. Thank you, Your Honor. Good morning and may it please the Court. There are two issues that I'd like to talk about on appeal today. The first is the District Court's grant of judgment as a matter of law that Perrigo's famotidine complete product did not infringe the claims of the 137 patent. And then the second issue is the District Court's denial of judgment as a matter of law that the asserted claims are invalid for either anticipation or obviousness. Can I just ask about your jurisdictional question? Yes. Even if I were to agree with you that at the motions panel stage there were mistakes made, once it went back, what could we do about that? Isn't that law of the case? Well, we agree that there is no jurisdictional issue. We agree that at the time the December order was entered there were still outstanding issues and that outstanding issue was primarily the enhancement of damages issue. Why does that reopen everything? I mean, the trial court said that the motions were untimely filed, right? The District Court did say that, correct? Right. So we effectively set aside that conclusion and told her to decide the motions, even though that appeal was never briefed or decided by a panel. It was it was decided by a panel, Your Honor. There was a there was an initial motion to dismiss this appeal that was decided by Judge Wallach. And in response to the motion for reconsideration, the argument was made, well, we have the second appeal that sort of reactivates things. But why wasn't that second appeal? Wouldn't that have been limited to A, was she wrong about the untimeliness of the Jamal motions? And B, was she wrong to deny the extension of your right to appeal? And then C, was she wrong about the enhancement? Right. Well, because this court found that she was not correct in dismissing or ruling that our motions were untimely. So that set aside everything. Where did we make that finding? You made that finding in the decision, a panel decision. I believe that was in June of 2017. It's an issued opinion. No, we just said that that it wasn't a final judgment when it came up. And so we deactivated the appeals. Where did we say her ruling with respect to timeliness of the Jamal? That was in that that was in the June decision. That was in the June decision that her ruling on timeliness was was wrong because the December order was not a final opinion. Because the enhancement of damages issues on timeliness as it relates to the right to appeal, the right to appeal. And then and then there was a another order entered by the district court. And we have timely appealed from that. That was her. That was her April, her April decision. The judge's April decision. All right. Now, should this court affirm the non-infringement finding? The court does not need to address all the other issues in this case because the patent in this case has expired. However, should this court disagree with the infringement finding, then you need to turn. Are there no pending further litigation on this patent? No, there isn't, Your Honor. And there are no further applications or patents pending as well. So even though you filed a counterclaim and a press for declaratory judgment, you are waiving that. In other words, you're saying if we if we agree that there's no infringement, you don't want us to decide the validity. That's correct. I mean, it it doesn't it does not have any real impact because the patent is expired. But in that case, though, if we're not deciding that question, we would have to vacate the any invalidity finding. Right. That's correct. That's correct. Okay. I'm going to address the invalidity issues first. I've set aside four minutes for this because that's the subject of our appeal. And I'll reserve my time. Of course, if you have questions on either infringement or invalidity, I'll take those at any time. I'd like to raise three quick points on on invalidity with respect to both anticipation and obviousness. The prior art need not show symptom relief data and the symptom relief data in this case are the five immediate and sustained relief, which we refer to in our briefs as ISR limitations. They don't need to disclose that to invalidate the claims. Instead, the claims are invalid if the prior art teaches effective amounts of the H2 blockers and acids that would provide the immediate and sustained relief. The second point is the claims are obvious because the prior art in this case does not teach away from combining antacids and H2 blockers to treat episodic heartburn. And the third issue on invalidity is that Paragore would be at least entitled to a new trial on the question of anticipation by Davis because the jury failed to address this in the first instance. All right, so putting aside the corroboration issue, which we can still address, but if Davis is prior art, why shouldn't we read the court's judgment to say that no reasonable jury could conclude that Davis anticipates? And the reason, Your Honor, is that both parties submitted evidence on Davis and then it went to the jury. The jury then found that the patent was entitled to an earlier priority date, which the district court then overruled. So the record is full of evidence to show that no reasonable juror could have found that Davis does not anticipate the claims of the 137 patent. So the record is already fully developed on Davis, and we submit that the record is such that no reasonable juror could come back and find that Davis does not anticipate claims of the 137 patent. But that's different from saying it should have gone to the jury. I mean, correct. That is different than saying it should have gone to the jury. So what you're saying is to the extent that the judge's ruling was that even if Davis is prior art, it shouldn't go to the jury because no reasonable jury could conclude that, that that's wrong. Correct. Now, turning to the issue of immediate and sustained relief in the prior art, this court's decisions make it clear that merely discovering and claiming the results of known methods of treatment directed to the same condition are not patentable. That's clear. And those cases are cited in our briefs at pages 46-47 and 51-52 in our opening brief. And here, the 137 patent claims the single step of orally administering antacids and H2 blockers in effective amounts to treat episodic heartburn and to provide immediate and sustained relief. And the 137 patent explicitly discloses that certain dosages of antacids and H2 blockers will actually provide that immediate and sustained relief. When you look at the prior art, these references teach co-administering antacids and H2 blockers, and they also teach overlapping dosage amounts or the same or similar dosage amounts as those disclosed in the 137 patent as providing immediate and sustained relief. The prior art provides these overlapping or similar ranges of active ingredients used in the same method of treating the same disease. That renders the claims invalid. Now, BWH argues that this position is somehow irreconcilable with our position on non-infringement, and that's simply not the case. It is just the opposite, right? I'm sorry. Are you arguing inherency or just result of? Yes. No steps. For anticipation, we're arguing inherency, and that was clear at the district court level. It's not a new argument as BWH contends. The jury was actually charged on inherency. With respect to obviousness, we're asking the court to follow its decisions in the Alcon Research case, the Richardson-Vicks case, the Novo Nordisk case, which says, look, if you have a known method of treating a known disease, and you claim a result, it's not patentable that the result, it's not patentable to simply claim the result. And in this case, the method that is taught in the 137 patent is simply orally administering H2 blockers and antacids in effective amounts. That was squarely in the prior art. But didn't you argue just the opposite with respect to infringement? Well, the difference here, Your Honor, is with respect to infringement... So your answer is yes, but you're going to explain why. And the reason why it's different on infringement is that the accused product had different dosage amounts than the prior art. The prior art has dosage amounts that overlap and are the exact same as those in the 137 patent. With respect to the accused product, much lower dosage amounts. The dosage amounts of antacids are much lower, and in fact, famotidine, or the H2 blocker dosage amount, there's not even a disclosure in the 137 patent about what that should be. So you can't just simply rely on effective dosage amounts with respect to the accused product. You can rely on that with respect to the prior art. I see I'm well into my rebuttal time. All right. I'll save it for you. Thank you. Mr. Bollinger, are you intending to save any amount, any time for cross-appeal? Yes, I'm going to start with 10 minutes and then 5 minutes for rebuttal. Is that okay? All right. Rebuttal only in the cross-appeal. That's correct. May it please the Court. I'd like to talk about infringement first. In particular, the fact that the jury verdict in this case found infringement, willful infringement, and ruled for that verdict was taken away on the basis that the District Court believed that the immediate relief required by the claim had not been demonstrated for the accused formulation. And that's not the case. The evidence on this was extensive, and the District Court, in reviewing it, only looked at a part of it. And so I'd like to go through that evidence quickly and identify a couple things. But I just wanted to… The accused formulation had an antacid in it. How could it not be providing immediate relief? That's absolutely correct. And, in fact, during the trial, that was an undisputed issue. In fact, their testimony at trial on invalidity was directed specifically to claiming that every antacid shown in the prior art provided immediate relief. And the statement by my colleague today, where that there was a difference in dosage in the accused products as compared to the prior art, is the very first time that issue has been raised as a non-infringement position, as you'll see in the briefs and the trial record below. So the reality is, is that when you look at Figure 7 from the NDA, it shows a pH drop… I'm sorry, a pH increase of two orders of magnitude within two minutes. And it… But more importantly, it also shows that the pH of the composition, the accused formulation, was the same, performed the same as antacid, demonstrating that the equivalence between those two, an exact match. In addition to that evidence, we submitted evidence from two tests, 110 and 127, that demonstrated that within the first 15 minutes of dosing, the largest portion of the test clinical patients received adequate relief. That was discarded during the JMAW process as a different parameter. It is a different parameter than what the claim calls for, which is onset of relief. Onset relief actually is undisputed, occurs before adequate relief. And in fact, the patent talks about a significant period of time between those two events. So when you show adequate relief, substantial adequate relief after 15 minutes, it's reasonable for the jury to infer onset of relief within the about 5 to 10 minutes of the claim. As I said, everybody in the courtroom during the trial understood that antacids provide immediate relief. That was the testimony of their witnesses. That was the testimony of our witnesses. In addition, I'd like to… that the relief would fall within the 5 to 10 minutes. Yes, there was. Who? Dr. Wolf testified to that effect, and it's at A7859, and he's talking about Figure 7. He says the bold dashed line, which is at the 2-minute mark, refers to the antacid in each preparation, whether it's FACT, which is the combination therapy, or antacid alone. The increase in pH occurs very quickly, so therefore the onset of relief would occur around that time, and that's at 2-minute mark. But I thought on cross-examination he conceded that the mere… that there's not an exact correlation between antacid reduction and relief, and that's a different question. What he did say is that pain relief is a more complicated subject, and clearly full, adequate relief, as described in the patent, takes longer than the about 5 to 10 minutes. And you'll see, actually, in the Purdue decision that's cited in the briefs, they talk about onset of relief being a more standardized way of looking at these types of phenomena in medical treatment. And that's a case involving painkillers. But the onset of relief, when he said that it was a more subtle point for full relief, that's true. But onset of relief here, I think the evidence was rather conclusive. Dr. Byrne testified to that effect also, that the evidence demonstrated that onset of relief occurred within the first 5 to 10 minutes. Now, regarding validity. Yeah. Opposing counsel says that this is a method of providing immediate and sustained relief by orally administering a compound that provides immediate relief and another one that provides sustained relief. And the rest of it is all surplusage. It's all a result. It's all the inherent result of what you get from administering these two compounds. I'd like to – and that's their position. Quite frankly, the claim is more complex than that. And isn't it anticipated by Davis? No. No. And the reason it's not anticipated by Davis on the merits is that Davis doesn't disclose anything about treating episodic heartburn, which is a method of treatment. And the Perricone case makes clear that even if you had a known compound, but if it's for a new treatment, that's patentable. Perricone says that. So it's not just claiming the result, because episodic heartburn was a defined term in this case. Their expert that presented this to the jury testified that heartburn is heartburn. It doesn't matter. But the court's definition on this is quite clear. Episodic heartburn excludes disease states, and therefore that's what Davis is all about, disease states, and therefore it doesn't disclose it. But there's other reasons Davis doesn't anticipate it. The second reason is that it doesn't disclose the treatment as needed, which is in nursing vernacular PRN, where you treat against symptoms. Davis doesn't disclose any treatment regimen whatsoever, so it can't explain, it doesn't provide that capability. Davis does not include any teaching that would capture the notion of relief, what's called sustained relief, which would last just as long or longer, which is what the surprising synergy here is that our inventor discovered. So Davis discloses treating symptoms of excess stomach acidity. Yes. Which an antacid would do. Yes. And with an H2 antagonist, which prior art shows provides sustained relief. It does not. The prior art, as tagamate was this incredible drug, very successful, people looked at it closely for decades to see what they could do with it. And it was tested routinely with antacids and proven over and over again that when you simultaneously dose with an antacid, the absorption of the tagamate drops substantially. 40% is what Dr. Steinberg said. That's classically teaching away. There are references that show no interference. Not no interference. I disagree with that. They show less interference. Don and Dessinger. But Dessinger shows 30% drop with another compound called nizotidine. Don shows 10% drop with rinitidine, which is what I think Dessinger shows. But what you see uniformly through all the publications from during this entire relevant time period up through the mid-'90s is that everybody talks about the absorption problem. The France patent that they cited against us says we have a solution, granulation. The Davis patent says, yes, here's this big problem. We have a solution. Control the pH around the parietal cell. They're all proposed solutions, but they're all proposed solutions for the specific treatment of serious ulcer disease. Not one of them talked about, well, why don't we try something that actually might be useful for people who are suffering this very mild discomfort associated with what we call dietary indiscretions. The wrong food before, you know, at dinner. And that's what Dr. Wolff discovered, is that when you use this medicine in that combination for episodic heartburn in the ratios that he identified, and he was able to demonstrate that you extended the relief from the H2 as opposed to ‑‑ but there are two issues I'd like to jump on. One is the invention date, because, quite frankly, Davis isn't even prior art. And the record shows pretty clearly that the Davis reference is ‑‑ was after the ‑‑ published well after Dr. Wolff's work. Dr. Wolff testified that corroboration was dictated to the jury. The jury found corroboration and found that the invention date was earlier than Davis. It was premised on evidence of his own work, his recordings of the clinical studies by the patients themselves who collected it. And also the information that's found in the patent, published ‑‑ I mean, filed four months later, which included a recitation of those same examples that are found in his notebook, confirming the accuracy of those. And then finally ‑‑ Is that an unwitnessed notebook? It's an unwitnessed notebook. However, it fit the definition of ‑‑ that was the jury instruction to the jury on corroborating evidence, a document or testimony of another with personal knowledge. And so the instruction on that was clear. Unlike the Proctor and Gamble case, we're not just talking about a page or two from a notebook. No. We're talking about the entirety of his work. The entire record of his clinical studies with his ‑‑ and the analysis. And then he went out afterwards and he got affidavits from them and said, could you confirm what took place with those clinicals, the dates and everything? They signed them, notarized them, submitted them. They weren't entered, but they were discussed. The other reason Davis shouldn't be considered is because this inherency argument never presented to the jury. And they're not ‑‑ they shouldn't be entitled to present brand new arguments for the first time on appeal. The whole comparison to the 137 patent that's in their brief never presented to the jury. The jury had no information about that. Now, if I ‑‑ can I just spend a minute or two on obviousness so I can address more? You have almost four minutes to use. I'll just use ‑‑ I have to address the obviousness argument because the obviousness, I have two words for obviousness. Gerd and Concomitant, their theory of obviousness was predicated on the PDR being combined with these other references. And the PDR, their argument was, and their expert testifies says, it's GERD. It discloses the use of these medicines for GERD, and that's the same as episodic heartburn. But the definition of episodic heartburn clearly precludes that. GERD was a disease. Episodic heartburn is a painful condition associated with nondisease state. The other aspect of it was concomitant. That's a word that I just heard for the first time in this case. They argue ‑‑ It might even be concomitant. Concomitant would probably be better. It's ‑‑ they said it means simultaneous. They argued to the jury, simultaneous. But if you read the PDR on Tagamet, it clearly says concomitant use of antacids is fine. Simultaneous should be avoided. And their witness, their expert, had to concede that that demonstrated that there was no ‑‑ they were not synonymous, and therefore the PDR doesn't support the obviousness case. Clearly, the unexpected results here were substantial. The whole industry knew you couldn't combine these things. There's never been a successful drug based on the combination of H2 with an antacid for ulcer treatment. The only successful one is the one that Dr. Wolf developed. Thank you, and I'll reserve the rest of the time. Mr. Galgano has the time. I'd like to address the infringement or non‑infringement issues, Your Honor. Can I first ask a question about inherency? I tried as I might, I could not find you making that argument to the jury. So, we made the argument through the expert, Dr. Tornay, who argued, or not argued, who testified that the effect, the amounts of antacid and H2 blockers in all the prior art, Davis, DeSager, and the Don reference, which are largely the three primary references, he testified that those were effective amounts, and that's how we know we would get immediate and sustained relief. That was his testimony. And they never contested that at trial. Their position was the prior art doesn't disclose any symptom relief data, therefore, it can't anticipate or it can't render the claims obvious. They never addressed the dosage amounts. That's the exact same argument you made on the other side in infringement. You can't infringe because there's no symptom relief data. That's exactly right. But you don't need symptom relief data if you want to prove it. And the reason for that is the case law. Obvious? Yes, the case law on obviousness and anticipated. You still have to have immediate and sustained relief. It's how you go about showing it. For invalidity, you can show it by pointing to the effective amounts that overlap with the ranges in the 137 patent, and that's exactly what we did at trial. With respect to infringement, you can show it in a number of different ways. The way they should have done it was actually take our product and test it, but they never did that. I suspect they didn't do that because the dosage amounts were so low, they knew they would not get immediate and sustained relief. So what they did is they tried to do it through some third-party product. The problem was the third-party product did not have in the NDA the same parameters of the claim limitations in the 137 patent. And I think, more importantly, Dr. Wolff admitted that immediate and sustained relief, when you read the claim, you need to have all five components of immediate and sustained relief must be felt by the person who takes the drug. And Dr. Wolff admitted on cross-examination that there was no evidence of any one patient in either PEPCID-Complete's NDA or in Paragos A NDA that that one person got all five components. That admission is critical. That admission is not infringement. And following this Court's cases from Johns Hopkins, the Qualcomm, Parker Vision v. Qualcomm case, and the Smith v. Garlock case, that was exactly enough for the district court to overturn the jury verdict. Now, the district court actually went in and looked at the evidence that they submitted, BWH. They looked at Study 98. And Study 98 measured esophageal pH. It didn't study heartburn relief. And more importantly, there's no evidence that those patients were suffering from heartburn during the 5 to 10 minutes. Here's what the FDA said about Study 98. And this is in the record at 7046. And this is a quote. Neither the occurrence nor the severity of heartburn or other symptoms were recorded, and no analyses were done to correlate those observations with the pH recordings. In other words, simply because they had some pH readings and they were graphed, the FDA said that doesn't supplement or take the place of actually testing it to see whether or not you get immediate relief within 5 to 10 minutes. And that's what the district court relied on in granting JMAL. And then with respect to the symptom relief studies that my colleague referred to, Protocols 110 and 127, again, he said that they measured relief within the first 15 minutes. Not true. The first measurement was done at 15 minutes. And it measured adequate relief. And Dr. Wolf, their expert, admitted on cross-examination that adequate relief is not analogous to the immediate relief in the 137 patent. And he specifically stated it's onset versus adequate relief, different parameters. And that's in the record at page 7846. And that's exactly what the district court said. Clearly we've got adequate relief that was measured by clinical studies. Why isn't the pH reduction in acid enough to allow the jury to conclude that the relief started sooner? Because there was no link between the adequate relief at 15 minutes and the pH. Those were two separate studies. And Dr. Wolf did not bridge the gap. He did not say that the pH study in 98 tells me that those who get adequate relief at 15 minutes would get it earlier. And this means within 5 to 10 minutes. And there was no doctrine of equivalence issue in this case. They waived doctrine of equivalence. There was simply nothing to fill that gap. And I understand that adequate relief at 15 minutes might seem close to getting relief within about 5 to 10 minutes. But they have to show that they get relief within 5 to 10 minutes, and they failed to do so. Thank you, counsel. Thank you, Your Honor. Mr. Bolger has a little more than two minutes on the cross-appeal. Thank you very much. The statement that the quote from the FDA that was just read into the record, if you look at the entire quote, at the beginning it's talking about something called rescue myelanta, which was used during the test protocol. And that was during when patients would suffer during in-between sessions, they would take rescue myelanta, which is an antacid, and that quote has to do with the fact that it wasn't recorded, and therefore that undermined that particular part of the study. It did not in any way affect the figure 7 data, which goes to the pH drop within two minutes and the logical conclusion. Now, remember, this is a JMAW motion. The verdict came in on infringement. The standard on this is that we get all the inferences to our favor, reasonable inferences. It's clearly a reasonable inference to have the jury conclude based on data that's collected at the 15-minute mark for what transpired in the first 15 minutes as reflecting immediate relief within that time period. Specifically, the court also granted a provisional new trial. We believe that was a mistake because the evidence on this was all one-sided. We've put in all the evidence. They had no rebuttal. They didn't have a witness get up there and say, it's not immediate. They didn't have a witness who in any way contested any of the evidence that we presented on this, and therefore there's no need to do a retrial if the court agrees with us that the JMAW was improvidently granted, because the first circuit law on this indicates that there's less deference. It's an abusive discretion standard, but it is less deference to that. And here, in their reply brief, they didn't even oppose that aspect of it, the great weight of the evidence prong of a new trial. They said that there was prejudice, and there was clearly no prejudice in this regard. That's the rest of my time. If you have any questions, I would be glad to try to address them. Thank you. No questions? Thank you. Thank you, Your Honor. Thank you. All rise.